IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                          Criminal No.:  ELH-18-017

CURTIS MORTEN,

Defendant.

**MEMORANDUM OPINION**

Curtis Morten, defendant, entered a plea of guilty in March 2019 to a Superseding Information (ECF 473) charging conspiracy to distribute 100 grams or more of a mixture containing a detectable amount of heroin.  ECF 483.  In June 2019, Morten was sentenced to 84 months' imprisonment, with credit from February 23, 2018.  ECF 595.  He is currently serving his sentence at FCI Fort Dix.  ECF 937 at 4.

While self-represented, Morten filed a motion for compassionate release.  ECF 676.  At the request of both parties, I stayed briefing after counsel was appointed for Morten.  ECF 706.  Thereafter, through counsel, Morten filed an amended motion for compassionate release (ECF 937), supported by exhibits.  ECF 937-1.  I will refer to ECF 676 and ECF 937 collectively as the "Motion."  Both Morten and his counsel have also filed additional submissions.  *See* ECF 700; ECF 724; ECF 729; ECF 835; ECF 955; ECF 963; ECF 964.

The government opposes the Motion.  ECF 976 (the "Opposition").  The Opposition is supported by exhibits (ECF 976-1), which include copies of defendant's medical records from the Bureau of Prisons ("BOP").  Morten has replied.  ECF 990 (the "Reply").

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion.

## I.  Background

Morten and 17 other people were indicted on January 11, 2018.  ECF 1.  A Superseding Indictment was filed on March 22, 2018.  ECF 157.  In a Superseding Information filed on March 25, 2019 (ECF 473), Morten was charged with one count of conspiracy to distribute and possess with the intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 846 (Count One).

On March 25, 2019, Morten entered a plea of guilty to Count One (ECF 483), pursuant to a Plea Agreement.  ECF 479.  The Plea Agreement contemplated a base offense level of 30, based on the quantity of drugs involved in the offense, and before reductions for Morten's acceptance of responsibility for his criminal conduct.  *Id*. ¶ 6.  There was no agreement as to defendant's criminal history.  *Id*. ¶ 7.  Notably, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the parties agreed to a sentence ranging from 60 months to 120 months of imprisonment.  *Id*. ¶ 9.

The Plea Agreement included a stipulation of facts.  ECF 479 at 9-10.  According to the stipulation, beginning at least as early as March 2017 and continuing until January 2018, Morten "conspired with others to obtain wholesale quantities of heroin and distribute one kilogram or more of that heroin at the street-level."  *Id*. at 10.  Morten did so as a member of the "Good Pussy" heroin shop, which primarily operated around the 5100 block of Fairlawn Avenue in Baltimore. *Id*.

Investigators placed two pole cameras in relevant locations, with which they captured video evidence of drug trafficking by Morten and his co-conspirators.  *Id*.  "On an almost daily basis," one of the pole cameras captured Morten "directing drug customers, holding packs of heroin, and

providing customers with heroin." *Id.* Through a phone intercept on a coconspirator's telephone, investigators also heard Morten and the coconspirator coordinate the operations of the drug shop. *Id.* The government's evidence also included the seizure of narcotics and narcotics paraphernalia. *Id.* Morten agreed "that it was reasonably foreseeable to him that members of the conspiracy would distribute one kilogram or more of heroin." *Id.*

Sentencing was held on June 25, 2019. ECF 594. At that time, Morten was 47 years old. *See* ECF 559 (Presentence Report or "PSR") at 3. The PSR reflected a base offense level of 30 and, after deductions for acceptance of responsibility, a final offense level of 27. *Id.* ¶¶ 12, 19-21.

In addition, the PSR reflected ten prior criminal convictions in courts in Maryland and Georgia. Five of the prior convictions were related to controlled substances offenses (*id.* ¶¶ 25, 27, 28, 29, 30), and three were theft offenses. *Id.* ¶¶ 31-33. Moreover, in 1991 Morten was convicted in the Circuit Court for Baltimore City of second degree rape. *Id.* ¶ 26. And, in 2012 Morten was convicted in the same court of failure to register as a sex offender. *Id.* ¶ 34. But, only the three most recent convictions scored points. *Id.* ¶¶ 25-35. This yielded a criminal history score of four points and a criminal history category of III.

The PSR noted that the advisory guideline range called from a period of imprisonment of 87 to 108 months. In addition, the PSR recounted Morten's history of substance abuse, dating to age 15, including alcohol, marijuana, cocaine, crack cocaine, heroin, and various other substances. *Id.* ¶¶ 58-68. And, defendant has a GED. *Id.* ¶ 69.

Defendant is 4'11" tall and, at the time of sentencing, he weighed 204 pounds. *Id.* ¶ 51. He sustained a gunshot wound at age 17 and was hospitalized for seven months. *Id.* ¶ 52. Moreover, he had a double hip replacement in 2008. *Id.* One became infected in 2015, for which the defendant underwent surgery. ECF 937 at 3.

3

As noted, I imposed a total sentence of 84 months' imprisonment, followed by five years' supervised release.  ECF 595 at 2, 3.  And, Morten received credit for pretrial detention, dating to February 23, 2018.  *Id.* at 2.  I also recommended Morten's participation in the Residential Drug Abuse Program at the BOP.  *Id*.

Morten was previously incarcerated at FCI Loretto, but was transferred to FCI Fort Dix in February 2021.  ECF 937 at 4; ECF 964 at 1.  The BOP indicates a projected release date for Morten of March 2023, as well as a home detention eligibility date of September 2022.  ECF 955-1 at 4-6.  *See Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Oct. 25, 2021).  Keeping in mind the credit defendant received for his time in custody since February 2018, Morten has currently served about 44 months of his 84-month sentence, or approximately 52%.

The record does not reflect any disciplinary infractions by Morten during his current period of incarceration.  Notably, Morten contracted COVID-19 in November 2020 while at FCI Loretto. ECF 937 at 5; ECF 937 at 4-6; ECF 976-1 at 40, 93.  Morten asserts that his various health conditions, discussed *infra*, "caused [his] body a difficult time healing from the virus."  ECF 964 at 1.  Medical records from this period reflect a headache, body aches, and a prescription for acetaminophen.  ECF 976-1 at 39, 76-79.

Morten's medical records also indicate that in January 2021, he declined an opportunity to receive the Pfizer COVID-19 vaccine.  ECF 976-1 at 94, 147-48.  In the Reply, Morten attributes this refusal to "his 'deeply held religious beliefs'" as well as his fear that the vaccine "might have a deleterious effect on his deteriorating and painful bones and joints," without providing additional detail.  ECF 990 at 1.

Morten represents that if he is released, he will return to Baltimore to live with his brother, his brother's wife, and his brother's son.  ECF 937 at 4.  Due to Morten's physical disability, "employment may not be available," but his brother and his brother's wife "are willing to fill any deficiencies in [Morten's] income from the State in order to live."  *Id.*

Morten filed an administrative request for compassionate release on May 12, 2020, which was denied by the Warden on May 18, 2020.  ECF 937 at 1; ECF 937-1 at 1.  On June 18, 2021, Morten filed an administrative appeal of the Warden's decision.  ECF 937 at 1; ECF 937-1 at 2.  The record does not reflect any action on the administrative appeal.  The government does not contest that Morten has exhausted his administrative requirements.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the Bureau of Prisons ("BOP").  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008)

(denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress enacted the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276. That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the

safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.   In U.S.S.G. § 1B1.13, the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  It is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." *See McCoy,* 981 F.3d at 276-77. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy,* 981 F.3d at 276. But, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes

7

1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

In resolving a compassionate release motion, a court must also consider the factors in 18 U.S.C. § 3553(a). *See Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (Mem.) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). And, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

However, as indicated, § 1B1.13 was last updated in November 2018, before the enactment of the First Step Act. It is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283.   Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id*. at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.   *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).   If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 827.   But, compassionate release is a "rare" remedy.   *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[1]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[2]  Defendant filed his

---

[1] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid*. 201.

[2] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease*

initial motion for compassionate release in April 2020.  ECF 676.  At that time, the nation was "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis.  This is because the virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  As of November 1, 2021, COVID-19 has infected more than 45 million Americans and caused

---

*and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

approximately 745,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Nov. 1, 2021).

Although this country saw a reduction of cases in prior months, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months").  Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants").

But, in recent weeks, the trend has again become more favorable.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").  Even so, health authorities warn that there remain reasons for caution, including the relatively low levels of vaccination in some parts of the country, as well as the encroachment of colder weather and the impending holiday season, which will lead

to an increase in the number of indoor gatherings, where the virus can more easily spread.  *See* Kamp & Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  Most recently in October 2021, it again updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Oct. 14, 2021), https://bit.ly/38S4NfY.  According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; and substance use disorders.  *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe

COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, prisoners are not free to follow their own safety rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.

Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[3]

---

[3] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

---

facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

More recently, on April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.*  Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since expanded considerably, and the vaccine was recently approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021,  https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.  Approximately 68% of all persons twelve years of age and older are fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Nov. 1, 2021).  And, 58% of the total U.S. population is fully vaccinated.  *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of November 1, 2021, the BOP had 133,043 federal inmates and 36,000 staff. And, by that date, the BOP had administered 239,924 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Nov. 1, 2021).

As of November 1, 2021, the BOP reported that 148 out of a total 133,043 federal inmates and 351 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 42,747 inmates and 8,190 staff have recovered from the virus; and 266 inmates and seven staff members have died from the virus. Moreover, the BOP has completed 124,205 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Fort Dix FCI, where defendant is imprisoned, the BOP reported that as of November 1, 2021, out of a 3,160 total of inmates, three have tested positive. And, five staff members have tested positive for COVID-19, and 1,630 inmates and 101 staff have recovered at the facility. In addition, 2,058 inmates, as well as 261 staff members, have been fully inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, *supra*; *FCI Fort Dix*, Federal Bureau of Prisons, http://www.bop.gov/locations/institutions/ftd (last visited Nov. 1, 2021).

## IV.  Discussion

Morten has moved for compassionate release on the basis of a number of chronic medical conditions, including degenerative joint disease,[4] high blood pressure, diabetes, hepatitis C, "and

---

[4] Degenerative joint disease, also known as osteoarthritis ("OA"), "is the most common form of arthritis." *Osteoarthritis (OA)*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/arthritis/basics/osteoarthritis.htm (last visited Oct. 26, 2021). The CDC

what may be depression." ECF 937 at 3. In addition, he represents that as a result of his degenerative joint disease, he cannot lose weight. *Id.* at 4. He argues that these medical conditions render him particularly vulnerable to COVID-19, and thus constitute an extraordinary and compelling reason for relief. *Id.*

Defendant's medical records show that in September 2020, he weighed 211 pounds. ECF 976-1 at 71. But, by June 2, 2021, he was down to 182.5 pounds. *Id.* And, as mentioned, he is 59 inches tall. *Id.* In addition, an x-ray report for defendant from May 19, 2021, indicated "[m]oderate-severe right and moderate left glenohumeral joint osteoarthritis" in Morten's shoulders. ECF 955-1 at 1. The report also reflected "[m]inimal-mild lumbar spine disc degeneration" and "[o]steoarthritis involving the bilateral elbow joints with elbow effusions," among other observations. *Id.* at 2.

The government asserts that defendant's records show a body mass index of 37. ECF 976 at 19. It also concedes that Morten "has established the minimum threshold showing for compassionate release" based on his obesity and type 2 diabetes. ECF 976 at 16-19.[5] However, it argues that Morten no longer presents any extraordinary and compelling reason for relief because he has refused the COVID-19 vaccine, as noted. *Id.* at 19-27. But, it does not address defendant's claim for a religious exemption. Furthermore, it argues that the sentencing factors in 18 U.S.C. § 3553(a) support a denial of relief, based on the seriousness of Morten's offense and his extensive criminal history. *Id.* at 27-29.

---

explains: "With OA, the cartilage within a joint begins to break down and the underlying bone begins to change. These changes usually develop slowly and get worse over time. OA can cause pain, stiffness, and swelling. In some cases it also causes reduced function and disability; some people are no longer able to do daily tasks or work." *Id.*

[5] From time to time, the government refers to defendant as "her" or "she." *See*, *e.g.*, ECF 976 at 19.

Numerous courts have found that chronic medical conditions such as those affecting Morten are an appropriate basis to grant compassionate release, including after the defendant in question had contracted COVID-19.  *See, e.g.*, *United States v. McDermott*, Crim. No. CCD-14-334, 2021 WL 4804019, at *2 (D. Md. Oct. 14, 2021) (obesity, hepatitis C, and other conditions); *United States v. Manzano*, 505 F. Supp. 3d 739, 743-47 (E.D. Mich. 2020) (diabetes and high blood pressure); *United States v. Fletcher*, Crim. No. TDC-05-0179-01, 2020 WL 3972142, at *3-4 (D. Md. July 13, 2020) (type 2 diabetes and hypertension); *United States v. Heyward*, PWG-17-527, 2020 WL 3547018 (D. Md. June 30, 2020) (defendant was 65 years old and suffered from a "myriad [of] health conditions" in addition to COVID-19, including hypertension, chronic viral hepatitis C, peripheral vascular disease); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (obesity); *United States v. White*, 13-cr-20653-1, 2020 WL 2557077, at *5 (E.D. Mich. May 20, 2020) (hypertension and obesity).

However, as Morten's medical records reflect (ECF 976-1 at 94, 147-48), and as neither party disputes (*see* ECF 976 at 19-27; ECF 990 at 1), Morten declined the COVID-19 vaccine in January 2021.  The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant," and that "[w]idespread vaccination is a critical tool to help stop the pandemic."  *Key Things to Know about COVID-19 Vaccines*,  Ctrs. for Disease Control       and       Prevention,       https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated Aug. 16, 2021).

The Reply offers two justifications for Morten's refusal of the vaccine, without providing detail for either.  The first is that refusal was due to Morten's "'deeply held religious beliefs.'"  ECF 990 at 1.  No further information was provided, however.  Second, Morten states that he "also

feared that the Covid 19 vaccine might have a deleterious effect on his deteriorating and painful bones and joints." ECF 990 at 1.  However, the Reply provides no scientific or other evidence that would support such a belief.

The government, for its part, maintains that Morten "has no known medical contraindication for the vaccine." ECF 976 at 20.  No authoritative evidence has been brought to the attention of the Court suggesting that Morten's asserted concern would justify his refusal to take the COVID-19 vaccine.  Indeed, the Arthritis Foundation has recommended the COVID-19 vaccine for some time.  *See COVID-19 Vaccines: Points of View From the Arthritis Foundation and Top Experts*, Arthritis Foundation, https://www.arthritis.org/health-wellness/about-arthritis/related-conditions/other-diseases/covid-19-vaccines-points-of-view-from-the-arthriti (last updated Dec. 18, 2020) ("We encourage our constituents and their families to follow the recommendations of Dr. Anthony Fauci and get the vaccine when it's available in their state.").

The Court is well aware of the decision in this district and others, concluding that a prisoner's refusal to take the COVID-19 vaccine undermines the claim of susceptibility to the effects of COVID-19.  As Judge Gallagher has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release. . . .  Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months."  *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see also United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May

3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, 1:16-CR-00103-JAW, 2021 WL 2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, 5:18-CR-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, CR 19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

Nevertheless, I shall assume, *arguendo*, that, despite Morten's unwillingness to take the COVID-19 vaccine, he has demonstrated extraordinary and compelling medical circumstances for compassionate release.

The Court must next consider whether, if released, the defendant would pose a danger to the community.  The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  Even where a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).  The Court must also consider the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186.

Morten, who is now 49 years of age, was convicted of a serious offense connected to a substantial drug trafficking operation.  He also has a significant criminal history, which includes multiple probation violations.  *Id*. ¶¶ 26, 30, 31.  Furthermore, he has only completed about half of his sentence.  And, that sentence was below the bottom of the Guidelines range.

To the defendant's credit, he withdrew from heroin during pretrial detention.  ECF 937 at 4.  And, defense counsel claims that defendant was merely "a street level lookout" for the drug dealers and that he was compensated with heroin during the conspiracy.  *Id.* at 5.  These factors are noteworthy, although Morten's role in the offense was more significant than counsel suggests.  According to the defense, Morten's conduct was motivated by his serious heroin addiction.  *Id.* Morten has also completed Non-Resident Drug Treatment and Coping Skills programs.  ECF 955 1 at 7-8.

On the whole, I believe that a reduction of the sentence to time served is not warranted at this time, given the gravity of the offense and the amount of the sentence that defendant has served.

### V.  Conclusion

For the reasons set forth above, I shall deny the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: November 2, 2021                                              _____/s/_____
                                                                   Ellen L. Hollander
                                                                   United States District Judge

22